USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 97-1233 UNITED STATES OF AMERICA, Appellant, v. ERIC GRAY SNYDER, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ _________________________ James F. Lang, Assistant United States Attorney, with whom _____________ Donald K. Stern, United States Attorney, was on brief, for the ________________ United States. Victoria L. Nadel for appellee. _________________ Murray Kohn on brief for Massachusetts Association of ____________ Criminal Defense Lawyers, amicus curiae. _________________________ February 12, 1998 _________________________ SELYA, Circuit Judge. In this single-issue sentencing SELYA, Circuit Judge. ______________ appeal, the government implores us to set aside defendant- appellee Eric Gray Snyder's sentence. The district court predicated that sentence on a disparity between the sentence mandated for the offense of conviction by the federal sentencing guidelines and the sentence Snyder likely would have received had state authorities prosecuted him. See United States v. Snyder, ___ _____________ ______ 954 F. Supp. 19, 22 (D. Mass. 1997) (memorandum explicating reasons for sentence). We thus confront a question of novel impression in this circuit: Is federal/state sentencing disparity a permissible basis for a downward departure? We answer that question in the negative. Consequently, Snyder must be resentenced. I. BACKGROUND I. BACKGROUND We touch lightly upon the facts of the case as they are only obliquely relevant to the legal problem that this appeal presents. On January 10, 1995, a known drug user, John Hawk, told a Boston police officer, William Doogan, that Snyder had robbed him and his paramour at gunpoint and stolen a number of Valium tablets. Hawk further stated that Snyder, driving a black Honda and accompanied by Frank Diaferio (a reputed drug dealer known to Doogan), was headed toward Roslindale. Doogan knew that Diaferio resided at 17 Murray Hill Road in Roslindale and he immediately arranged for police surveillance of that locus. When Snyder and Diaferio arrived in the black Honda, the officers found a loaded .32 caliber pistol in a locked briefcase in the 2 car's trunk. Doogan placed Snyder under arrest. During a search at the station house, police officers recovered 26 Valium tablets from Snyder's pants pocket. Initially, Massachusetts authorities charged Snyder under Mass. Gen. L. ch. 269, 10(a) (1990) with unlawfully carrying a firearm, an offense punishable by a 2 -to-5-year prison term. When a federal grand jury later returned an indictment that charged Snyder with being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1) (1994), Massachusetts dropped the state charge. In due course, a federal trial jury found Snyder guilty. The probation office thereafter prepared a presentence investigation report (the PSI Report). The PSI Report indicated that Snyder's extensive criminal history rendered him subject to the sentencing enhancement provisions of the Armed Career Criminal Act, 18 U.S.C. 924(e) (1994) (ACCA). Employing the corresponding sentencing guideline, USSG 4B1.4 (Nov. 1995), the PSI Report projected the guideline sentencing range (GSR) to be 262 to 327 months. Judge Harrington conducted a three-day sentencing proceeding. On October 9, 1996, Snyder's counsel and the prosecutor sparred over Snyder's insistence that he was not subject to the ACCA because certain of his prior convictions did not qualify as predicate offenses thereunder. See 18 U.S.C.  ___ 921(a)(20) (1994) (delineating various exclusions from the taxonomy of eligible predicate offenses). In the course of that 3 hearing, Judge Harrington expressed reservations about the steepness of the projected sentencing range. Afterwards, he issued a memorandum that noted his "grave concern" with the "gross disparity" between the GSR and the punishment that Snyder would have received had state authorities pursued and obtained a conviction on the originally charged state offense. In that memorandum, the judge made no bones about his disdain for "the unfettered and unreviewable discretion of the United States Attorney" to prosecute in federal court the "`local' offense of carrying a firearm." He concluded by scheduling a further hearing to address the issues "whether this disparity in sentences and the de facto selective prosecution of the defendant __ _____ raise any constitutional concerns and whether the combination of the above two issues justify [sic] a downward departure under USSG 5K2.0." At the resumed hearing, held on December 12, 1996, Judge Harrington reiterated his belief that sentencing Snyder to a 21-year prison term would constitute a "gross violation of the principles of justice." Engaging in what some might consider wishful thinking, the judge then predicted the demise of the sentencing guidelines: I said yesterday to the U.S. Attorney's Office, this type of de facto, selective prosecution continues. And when there is a disparity of over 20 years for the same offense, . . . the guidelines are going to be dismantled because the federal judiciary will no longer, no longer put up with it. It's going to be dismantled. Judge Harrington convened the third, and final, 4 sentencing session on January 14, 1997. He ruled that Snyder fell within the ambit of the ACCA and that USSG 4B1.4 therefore applied. He computed the GSR to be 235 to 293 months.1 Judge Harrington then departed downward pursuant to USSG 5K2.0 and sentenced Snyder to an incarcerative term of 180 months (the mandatory minimum under the ACCA). He premised the departure squarely on the ground that the federal/state sentencing disparity created by interleaved federal and state criminal jurisdiction over Snyder's conduct "is contrary to the very objective of and theory upon which the Guidelines are grounded and therefore takes this case out of the heartland and makes it atypical." Snyder, 954 F. Supp. at 22.2 The sentencing court's ______ rescript repeatedly condemns a system that cedes broad discretion to prosecutors to determine who will be charged federally and, thus, exposed to potentially harsher sentences when an offender's conduct violates both federal and state criminal  ____________________ 1The difference between the GSR projected in the PSI Report and that actually used stemmed from Judge Harrington's finding  not contested on appeal that the government had not proven that Snyder committed an armed robbery. This finding shrunk Snyder's base offense level from 34 to 33, see USSG 4B1.4(b)(3)(B), and ___ effected a commensurate decrease in the GSR. 2On appeal, Snyder attempts to divert our attention to alternative rationales that arguably support the downward departure. But Judge Harrington's decision makes no mention of such factors. To the contrary, he expressly stated that "[t]o this Court the issue raised is . . . one of disparity between the sentences to be imposed." Snyder, 954 F. Supp. at 22. As our ______ analysis must focus on the reasons given by the district court in support of a departure, we take no view of Snyder's post hoc justifications. See United States v. Dethlefs, 123 F.3d 39, 43 ___ _____________ ________ (1st Cir. 1997); United States v. Jackson, 30 F.3d 198, 202 (1st _____________ _______ Cir. 1994). 5 codes. See, e.g., id. at 21 (disparaging "disparate sentencing ___ ____ ___ treatment" brought about "by the exercise of absolute prosecutorial discretion"); id. at 22 ("For where unbridled ___ power, unchecked by judicial scrutiny, can by fiat determine that a certain person from among many similarly situated shall serve such a disparate sentence for the same offense, then the balance of governmental powers has become distorted and the liberty of every individual is held hostage to the potential tyranny of the Executive Branch."). II. STANDARD OF REVIEW II. STANDARD OF REVIEW We deal here only with the government's sentencing appeal.3 We review a district court's decision to depart from the guideline sentencing range for abuse of discretion. See Koon ___ ____ v. United States, 116 S. Ct. 2035, 2046-47 (1996). Our ______________ examination proceeds stepwise. First, we ascertain whether the guidelines permit the sentencing court's stated ground for departure. If so, we examine the record to discern the adequacy of the factual support that undergirds the departure. Finally, if the departure rests on satisfactory record support, we assess the reasonableness of its magnitude in light of the factual predicate. See United States v. Dethlefs, 123 F.3d 39, 43-44 ___ ______________ ________ (1st Cir. 1997). Here, the government concedes that the departure decision stands or falls on the first prong of the  ____________________ 3Snyder appealed his conviction and his classification as an armed career criminal. We heretofore affirmed his conviction. See United States v. Snyder, No. 97-1187 (1st Cir. Jan. 29, 1998) ___ _____________ ______ (unpublished). 6 test. Whether the guidelines countenance a particular ground for departure is a question of law. See Koon, 116 S. Ct. at ___ ____ 2047. While this legal question technically falls within Koon's ____ unitary abuse-of-discretion rubric, "[a] district court by definition abuses its discretion when it makes an error of law." Id. We determine the existence vel non of legal error without ___ ___ ___ special deference to the sentencing court's views. See United ___ ______ States v. Brennick, ___ F.3d ___, ___ (1st Cir. 1998) [No. 96- ______ ________ 1969, slip op. at 9]. III. ANALYSIS III. ANALYSIS We turn now to the validity of the district court's stated ground for departure. The twin stanchions on which our analytic framework rests are the generic departure guideline, USSG 5K2.0 (a guideline that flows directly from the congressional command embodied in 18 U.S.C. 3553(b) (1994)) and the Court's opinion in Koon. ____ Section 5K2.0 permits a sentencing court to deviate from the range indicated by an otherwise applicable guideline computation if it finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." In considering whether an appropriate "aggravating or mitigating circumstance" exists, the court first must ask "[w]hat features of th[e] case, potentially, take it outside the Guidelines' `heartland' and make of it a special, or unusual, case[.]" Koon, ____ 7 116 S. Ct. at 2045 (quoting United States v. Rivera, 994 F.2d _____________ ______ 942, 949 (1st Cir. 1993)). Judge Harrington believed that he had identified such a feature. In his view, the disparity between the sentence that Snyder would have received if convicted under Massachusetts law and the sentence mandated by USSG 4B1.4 was a mitigating circumstance that brought Snyder's case outside the heartland of armed career criminal cases and justified a downward departure. See Snyder, 954 F. Supp. at 22. It falls to us to ___ ______ test this conclusion. In mounting this inquiry, we do not write on a pristine page. Although the Sentencing Commission does not expressly proscribe federal/state sentencing disparity departures, five federal appellate courts have taken the measure of such departures. All have held that federal/state sentencing disparity is never a valid basis for a downward departure. See ___ United States v. Searcy, ___ F.3d ___, ___ (11th Cir. 1998) [1998 _____________ ______ WL 10237, at *2]; United States v. Deitz, 991 F.2d 443, 447-48 _____________ _____ (8th Cir. 1993); United States v. Haynes, 985 F.2d 65, 69-70 (2d ______________ ______ Cir. 1993); United States v. Sitton, 968 F.2d 947, 962 (9th Cir. _____________ ______ 1992); United States v. Dockery, 965 F.2d 1112, 1117-18 (D.C. ______________ _______ Cir. 1992). This impressive array of authority resists ready rejection. Snyder harps on two facts: most of these decisions predate Koon,4 and federal judges are less free under the Koon ____ ____  ____________________ 4The lone exception is Searcy, a case decided after this ______ case was briefed and argued. 8 regime to exorcise specific factors from the departure calculus. See Koon, 116 S. Ct. at 2051; Dethlefs, 123 F.3d at 46. That ___ ____ ________ rejoinder is true as far as it goes but it does not go very far. We are, of course, respectful of the change in emphasis that Koon betokens. Still, "[n]otwithstanding that most ____ categorical interpretations are disfavored under the Koon Court's ____ regime, some boundaries are essential if the guidelines are not to be emptied of all meaning." Dethlefs, 123 F.3d at 47. So ________ viewed, the pivotal question reduces to whether federal/state disparity trenches upon such an essential boundary. The letter of the sentencing guidelines is unhelpful in this instance. Departures based on federal/state sentencing disparity are not expressly permitted or forbidden in the guidelines' text, nor are they explicitly encouraged or discouraged. As a result, we must mull the "structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," Koon, 116 S. Ct. at 2045 (quoting Rivera, 994 F.2d ____ ______ at 949), in our effort to ascertain whether this factor conceivably may be of a kind, or present to a degree, inadequately considered by the Commission (and thus capable of removing a particular case from the "heartland" sculpted by a given guideline), see United States v. Clase-Espinal, 115 F.3d ___ ______________ _____________ 1054, 1057 (1st Cir. 1997). Relevant federal statutes, the guidelines themselves, their accompanying official commentary and policy statements, and the case law inform our inquiry. See id. ___ ___ So too does our expectation that such categorical bans will be 9 relatively rare. The Commission's enabling statute directs it to "establish sentencing policies and practices for the Federal criminal justice system that . . . avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct. . . ." 28 U.S.C.  991(b)(1)(B) (1994); see also USSG Ch.1, Pt.A, intro. comment. 3. ___ ____ The legislative history makes it crystal clear that Congress's allusion to "unwarranted sentencing disparities" reflected a concern with variations among federal courts across the nation, without reference to their state counterparts. See United States ___ _____________ v. Aguilar-Pena, 887 F.2d 347, 351-52 (1st Cir. 1989). In terms, ____________ then, the guidelines seek to promote uniform sentencing among federal courts in respect to federal crimes. See Deitz, 991 F.2d ___ _____ at 447; Sitton, 968 F.2d at 962. ______ The trial judge sought to elongate this principle, speculating that "it would only be logical that Congress would not favor disparity throughout the criminal justice system in an era of increased Federal-State cooperation in the investigation and prosecution of crime." Snyder, 954 F. Supp. at 22. With ______ respect, we think that elongating the principle in this way would destroy its structural integrity and, accordingly, that the trial judge's surmise is utterly inconsistent with the guidelines' theoretical underpinnings. If the guidelines' goal is to promote uniformity among federal courts when imposing sentences for federal crimes, then 10 departures aimed at alleviating federal/state sentencing disparity are flatly incompatible with it. Endeavoring to make a federal sentence more closely approximate that which a state court might impose for similar criminal activity would recreate the location-based sentencing swings that Congress sought to minimize when it opted for a guideline paradigm.5 See Searcy, ___ ______ ___ F.3d at ___ [1998 WL 10237, at *2]; Deitz, 991 F.2d at 447- _____ 48; see also Aguilar-Pena, 887 F.2d at 352 (warning that ___ ____ ____________ departures cannot be allowed to subvert Congress's "ardent desire to dispense with inequalities based on localized sentencing responses"). The short of it is that the guidelines did not sprout in a vacuum. Congress and the Sentencing Commission erected the present sentencing structure against the skyline of an extant criminal justice system, see Haynes, 985 F.2d at 69; Dockery, 965 ___ ______ _______ F.2d at 1117; see also Stephen Breyer, The Federal Sentencing ___ ____ _______________________  ____________________ 5One Commission member illustrated the swings that occurred in the pre-guidelines era by recounting the following findings: The region in which the defendant is convicted is likely to change the length of time served from approximately six months more if one is sentenced in the South to twelve months less if one is sentenced in central California. . . . [B]lack [bank robbery] defendants convicted . . . in the South are likely to actually serve approximately thirteen months longer than similarly situated bank robbers convicted . . . in other regions. Hearings on Sentencing Guidelines Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary, 100th Cong., 1st Sess. 554, 676-77 (1987) (testimony of Commissioner Ilene H. Nagel). 11 Guidelines and the Key Compromises Upon Which They Rest, 17 ____________________________________________________________ Hofstra L. Rev. 1 (1988), and that system includes overlapping state and federal criminal jurisdiction. The fact that the states impose different and varied sentences for criminal conduct that may also transgress federal law is about as obvious as a hippopotamus at a tea party. It is implausible to suppose that the Commission overlooked this large reality and therefore failed to account for it in formulating the guidelines.6 See Dethlefs, ___ ________ 123 F.3d at 47; Clase-Espinal, 115 F.3d at 1057. _____________ We add, moreover, that disparity between federal and state sentences in career offender cases is hardly serendipitous. Congress crafted the ACCA on the central premise that armed career criminals were being treated too gently by state courts  coddled, some might say and that these defendants ought to receive much stiffer sentences. See United States v. Jackson, 30 ___ _____________ _______ F.3d 199, 204 (1st Cir. 1994); see also 18 U.S.C. 924(e); H.R. ___ ____ Rep. No. 98-1073, at 5 (1984), reprinted in 1984 U.S.C.C.A.N. _________ __ 3661, 3665; USSG 4B1.4, comment. (backg'd.). For these defendants, significant disparity between sentences at the federal and state levels is the rule, not the exception. Hence, if Snyder is entitled to a downward departure on this basis, then virtually every defendant subject to the ACCA is similarly entitled. See Dockery, 965 F.2d at 1118. ___ _______  ____________________ 6We think it unremarkable that the Commission has not expressly forbidden federal/state disparity departures. Given that the guidelines were never intended to foster parity between federal and state defendants, Commission commentary on the subject would be supererogatory. 12 We are equally unimpressed with the district court's attempt to hang its finding of atypicality on an aversion to federal prosecutors' discretionary power to target defendants under federal law. See Snyder, 954 F. Supp. at 22. Different ___ ______ branches of government have different responsibilities, and the power to determine when to prosecute and when to refrain is, within broad limits, a prerogative of the Executive Branch. Accordingly, it is a "bedrock principle of our system of criminal justice" that a federal judge may not interfere with the government's prosecutorial decisions solely to vindicate his subjective view of the wisdom of a given enforcement strategy. United States v. Stokes, 124 F.3d 39, 46 (1st Cir. 1997). It _____________ ______ follows inexorably that the government's lawful selection of Snyder for federal prosecution has no relevance to the sentencing inquiry.7 For these reasons, we hold that federal/state sentencing disparity is not a feature that can justify a departure. Such departures would contradict hopelessly the guidelines' structure and theory as well as impinge impermissibly upon the Executive Branch's discretion to prosecute defendants under federal law. See Dockery, 965 F.2d 1118. ___ _______ We add a coda. The continuing federalization of criminal law increases the frequency with which federal/state  ____________________ 7We find no record evidence of an unconstitutional exercise of prosecutorial authority in this case. We note, moreover, that Judge Harrington himself ruled in an unpublished order dated December 27, 1997, that Snyder had failed to make out a prima facie case of selective prosecution. 13 sentencing disparities occur, see generally Steven D. Clymer, ___ _________ Unequal Justice: The Federalization of Criminal Law, 70 S. Cal. _____________________________________________________ L. Rev. 643 (1997), and we are not entirely unsympathetic to Judge Harrington's concerns about this trend. Still, judicial dissatisfaction with a particular aspect of the guidelines, "no matter how steeped in real-world wisdom, cannot be enough to trigger departures." Aguilar-Pena, 887 F.2d at 353; see also ____________ ___ ____ United States v. Muniz, 49 F.3d 36, 43 (1st Cir. 1995); United ______________ _____ ______ States v. Norflett, 922 F.2d 50, 54 (1st Cir. 1990). As long as ______ ________ federal and state sovereigns share jurisdiction over criminal matters, prosecutors will be able to expose selected defendants to elevated sentences. One can envision models designed to eliminate or minimize this circumstance, see generally Sara Sun ___ _________ Beale, Too Many and Yet Too Few: New Principles to Define the __________________________________________________________ Proper Limits for Federal Criminal Jurisdiction, 46 Hastings L.J. _______________________________________________ 979 (1995), but these models reflect structure and theory quite different from that embodied in the federal sentencing guidelines. Thus, the case for them must be made in Congress, not in the courts. IV. CONCLUSION IV. CONCLUSION In sum, federal/state sentencing disparity is not "a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. 3553(b). Hence, we vacate Snyder's sentence and remand for resentencing. 14 We close by addressing one further point. In our companion opinion, see supra note 3, we approved for the time ___ _____ being the district court's adherence to United States v. ______________ Estrella, 104 F.3d 3 (1st Cir. 1997), and rejected Snyder's ________ contention that 18 U.S.C. 921(a)(20) prevents his prior Massachusetts convictions from bringing him within the fold of the ACCA. We noted, however, that the Supreme Court recently granted certiorari to review this court's unpublished opinion in Caron v. United States, Nos. 96-2338, 2339 (1st Cir. May 9, _____ ______________ 1997), cert. granted, 66 U.S.L.W. 3444 (U.S. Jan. 9, 1998) (No. _____ _______ 97-6270), and prophesied that the Court's review of Caron will _____ encompass the relevant aspects of Estrella. Consequently, if the ________ defendant consents, the district court may choose to delay resentencing pending the resolution of Caron. Elsewise, the _____ district court should impose sentence consistent herewith, applying Estrella, but reserve to Snyder the right to seek ________ reconsideration should the Caron Court's decision materially _____ affect the sentence imposed. Vacated and remanded. Vacated and remanded. ____________________ 15